# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ARTEMUS SUAREZ-EDEN,**

        **Plaintiff,**

        v.                                       Case No. 07-C-442

**SCOTT R. DICKSON, et., al.,**

        **Defendants.**

## ORDER DENYING PLAINTIFF'S MOTION TO PROCEED IN FORMA PAUPERIS AND RECOMMENDATION THAT THE COMPLAINT BE DISMISSED

On May 11, 2007, Artemus Suarez-Eden ("Suarez-Eden") filed a pro se complaint against the defendants. Accompanying the plaintiff's complaint was a motion for leave to proceed in forma pauperis.

Before the court can allow the plaintiff to proceed in forma pauperis, the court is obligated to determine that Suarez-Eden is unable to pay the $350.00 filing fee and that his case (1) is not frivolous or malicious, (2) does not fail to state a claim upon which relief may be granted, and (3) does not seek monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2).

A claim is legally frivolous when it lacks an arguable basis either in law or in fact. Denton v. Hernandez, 504 U.S. 25, 31 (1992); Neitzke v. Williams, 490 U.S. 319, 325 (1989). The court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. Neitzke, 490 U.S. at 327. A complaint should be dismissed for failure to state a claim upon which relief may be granted if it appears

beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984) (<u>citing</u> <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). In reviewing a complaint under this standard, the court must accept as true the allegations of the complaint in question, <u>Hospital Bldg. Co. v. Rex Hospital Trustees</u>, 425 U.S. 738, 740 (1976), construe the pleading in the light most favorable to the plaintiff and resolve all doubts in the plaintiff's favor. <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421 (1969).

In his petition to proceed in forma pauperis, Suarez-Eden alleges sufficient liabilities and income to satisfy the court that he is indigent. Thus, the court will turn to the merits of Suarez-Eden's claims against the defendants.

**Factual Allegations and Causes of Action**

In September of 2005, Suarez-Eden met Scott Dickson ("Dickson") at a Global Action Christian Missionary event and the two become friends. (Compl. 12 ¶12.) Dickson is the senior vice-president and chief marketing officer of Midwest Airlines. (Compl. 11 ¶8.) In December of 2006, during dinner at Suarez-Eden's home, Dickson discussed AirTran's recent efforts to acquire Midwest Airlines. (Compl. 13 ¶13.) Suarez-Eden suggested that he organize a grassroots campaign in an effort to block AirTran's efforts. (Compl. 13 ¶13.) Suarez-Eden sought to undertake such an effort because it would help establish his "reputation as a positive change agent for Wisconsin and benefit Midwest." (Compl. 13 ¶13.) Dickson informed Suarez-Eden that Midwest management would be hiring professionals to coordinate the necessary public relations matters but nonetheless Suarez-Eden informed Dickson that he will conduct his own "independent grassroots campaign." (Compl. 13 ¶13.)

Suarez-Eden organized a press conference on December 24, 2006, which resulted in media coverage, and Suarez-Eden launched the website WILovesMidwestAirlines.com. (Compl. 13 ¶14.) Suarez-Eden undertook all these efforts at his own expense. (Compl. 13 ¶14.) On January 2, 2007,

Suarez-Eden appeared on WUWM's Lake Effect program and discussed his efforts to block AirTran's takeover bid. (Compl. 13 ¶15.)

On January 4, 2007, Suarez-Eden met with Dickson at an Applebee's Restaurant and Dickson informed Suarez-Eden that they must keep their contacts secret because it could be regarded as stock manipulation and may result in litigation between AirTran and Midwest. (Compl. 13 ¶16.) Nonetheless, Dickson encouraged Suarez-Eden's efforts and offered specific instructions. (Compl. 13 ¶16.) However, Suarez-Eden chose to follow his own instincts rather than Dickson's suggestions. (Compl. 13 ¶16.)

Also on January 4, 2007, Dickson allegedly sent an email to Suarez-Eden's wife discussing Suarez-Eden's efforts. This email, with the heading "CONFIDENTIAL - PLEASE ERASE AFTER READING," is included as page four of Suarez-Eden's complaint. In this email, Dickson states that Midwest is unable to "reward" Suarez-Eden for his efforts because if the media or AirTran learned of any connection between Suarez-Eden and Midwest, it may be used to discredit Suarez-Eden's efforts. (Compl. 4.) Therefore, Midwest must remain entirely separate from Suarez-Eden's efforts. (Compl. 4.) However, Dickson states, "When this business with AirTran is dead and buried, hopefully in a few weeks or months, we will look for ways to reward Art. I do not know what form that will take but his efforts will not be forgotten." (Compl. 4.) However, Dickson states that in the interim, Midwest is unable to "ask people to write a check." (Compl. 4.) The email then closes with Dickson asking Suarez-Eden's wife to call him if she needs to talk because "emails have long lives and can be pretty dangerous in situations like this. Please erase this reply and your original message. I will do likewise as we do not want to leave any track record of this type of discussion." (Compl. 4.)

On January 18, 2007, Suarez-Eden coordinated an event involving children baking cookies in an effort to raise money to purchase Midwest stock. (Compl. 13 ¶17.) This event resulted in substantial media coverage in Wisconsin and beyond. (Compl. 13 ¶17.)

On January 31, 2006, (the court assumes the date listed in the complaint is erroneous and the plaintiff intended the year to be 2007), Suarez-Eden announced his candidacy for Milwaukee County Executive. (Compl. 13 ¶19.) On February 2, 2007, Suarez-Eden drove to Washington D.C. to lobby the Wisconsin Congressional delegation. (Compl. 13 ¶20.) Suarez-Eden credits his efforts as resulting in Senator Herb Kohl's paying for a full page color advertisement that appeared on February 14, 2007 in the Milwaukee Journal Sentinel wherein various Wisconsin elected leaders expressed their support for Midwest Airlines. (Compl. 13 ¶21.)

At this point, Suarez-Eden concluded that the management of Midwest Airlines is not dedicated to resisting AirTran's takeover efforts but rather is most interested in elevating Midwest's stock price for the managers' own financial benefit. (Compl. 14 ¶21.) During the week of February 20, 2007, Suarez-Eden appeared on National Public Radio and CBS Market Watch to discuss his efforts to block AirTran's takeover efforts. (Compl. 15 ¶23.)

On February 27, 2007, Mike Zens ("Zens"), Midwest Airlines' manager of corporate security, (Compl. 12 ¶10), called Suarez-Eden and informed him that Dickson wanted to meet with him. (Compl. 15 ¶24.) The next day, Zens called again and Suarez-Eden informed Zens that he was not interested in meeting with Dickson. (Compl. 15 ¶25.) Later that evening, Zens called again and talked with Suarez-Eden for over an hour trying to convince Suarez-Eden to "cooperate with them as things are getting sensitive." (Compl. 15 ¶25.)

Suarez-Eden then met with Zens and Herman Pugh ("Pugh") secretly in the basement of Oconomowoc Hospital. (Compl. 15 ¶25.) Suarez-Eden alleges that Pugh and Zens "tried to

4

convince me to stop my campaign and explained he knew I was in financial straights and tried to bribe me. I refused." (Compl. 15 ¶25.)

On March 1, 2007, Suarez-Eden woke up "perturbed" at 5:30 AM and tried to reach Zens but was unable to do so. (Compl. 15 ¶25.) Suarez-Eden then decided to prepare a "briefing book" for Tim Hoeksema ("Hoeksema"). (Compl. 15 ¶25.) Suarez-Eden knew Hoeksema to be an evangelical Christian and so "communicated with him in biblical language to make certain points." (Compl. 15 ¶25.) Suarez-Eden then notes in his complaint that communicating in such a manner "is by no means an exhibition of mental instability." (Compl. 15 ¶25.)

Suarez-Eden attempts to contact Hoeksema but is told that he was not available. (Compl. 15 ¶25.) Instead, Suarez-Eden spoke with Carol Skornika ("Skornika"), Midwest Airlines' senior vice-president of corporate affairs and general counsel, (Compl. 12 ¶9), and Zens, who told Suarez-Eden to mail the box that he wished to deliver to Hoeksema. (Compl. 15 ¶25.) Suarez-Eden decided not to mail the box and instead drove to Midwest's corporate offices. Outside the building, Suarez-Eden immediately encountered Zens and Pugh. (Compl. 15-16 ¶25.) Zens ordered Suarez-Eden to put down the package and to get off the property. (Compl. 16 ¶25.) A short time later, Suarez-Eden was arrested by numerous police officers. (Compl. 16 ¶25.) The Milwaukee County Sheriff's Department Bomb Squad was called to Midwest Airlines' corporate headquarters to investigate the package that Suarez-Eden left behind. (Compl. 16 ¶25.)

Included in Suarez-Eden's complaint is a news report from the website of the Waukesha Freeman newspaper in which Suarez-Eden has interjected his own comments relating to the information contained in the report. For example, Suarez-Eden takes issue with the fact that the news report indicates that he threw the box when this verbiage is absent from the police reports and questions why the bomb squad responded despite Midwest management's suspicion that the box contained only papers. This news report includes quotes from Skornicka where she refers to Suarez-

5

Eden as "a very well-intentioned but misguided man." (Compl. 7.) Skornicka is reported to have further said in reference to Suarez-Eden, "He is very passionate about wanting to have Midwest Airlines remain independent. He clearly doesn't understand where to draw the line, and in this particular instance we wanted to err on the side of caution," and "He is actually a very charming man, so it certainly seemed like an easy enough relationship. But over time, we began to see he was doing some things that were a little bit over the top. I don't think that he's being effective on our behalf. We appreciate the spirit in which he does things, but he just doesn't understand what appropriate boundaries are." (Compl. 9.) Suarez-Eden alleges that Midwest's disapproval of his efforts, conclusion that Suarez-Eden was no longer being effective on Midwest's behalf, and Midwest's desire to set "appropriate boundaries," all indicate that Midwest is not interested in resisting AirTran's takeover bid and is willing to do whatever it takes to silence Suarez-Eden's grassroots opposition to AirTran's takeover.

As a result of the March 1, 2007 incident, Suarez-Eden was charged in Milwaukee County Circuit Court with disorderly conduct. (Case number 07CM1414.) This case is currently pending.

Suarez-Eden sets forth fourteen causes of action. In his first three causes of action, Suarez-Eden alleges that the defendants used "Its Influence & Financial Power to Interfere & Deny Mr. Artemus Suarez Eden's First Amendment Right to Freedom of Speech . . . Fifth Amendment Right to Equal Protection of the Laws . . . [and] Right to Property." (Compl. 17 ¶¶29-31.) The complaint also contains eleven other common law causes of action such as public disclosure of private facts, (Compl. 17 ¶35), intentional infliction of emotional distress, (Compl. 18 ¶38), libel and slander, (Compl. 18 ¶41), malicious prosecution, (Compl. 18 ¶43), and negligent misrepresentation, (Compl. 18 ¶44).

The jurisdiction of federal courts is limited. The majority of Suarez-Eden's claims are matters that are subject to state court jurisdiction. Such state claims could only be resolved in

federal court pursuant to this court's supplemental jurisdiction, but for such jurisdiction to apply, Suarez-Eden's complaint must allege a federal cause of action that predominates over Suarez-Eden's state law claims. See 28 U.S.C. § 1367.

As a basis for this court's federal jurisdiction, Suarez-Eden argues that the defendants violated 42 U.S.C. §§ 1985(3) and 1986. The only substantive causes of action that relate to Suarez-Eden's claim that the defendants violated § 1985(3) are those contained in paragraphs 29-31 of the complaint. As for Suarez-Eden's first claim that the defendants violated § 1985(3) by violating his First Amendment rights, (Compl. 17 ¶29), the United States Supreme Court has expressly rejected the contention that an individual may pursue a claim against private individuals for an alleged violation of the First Amendment absent evidence of state involvement. United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 832 (1983). Thus, because Suarez-Eden's complaint is devoid of any reference to state action in the alleged deprivation of his First Amendment rights, this cause of action is not viable.

As for Suarez-Eden's allegation that the defendants deprived him of equal protection of the laws and his right to property, the Supreme Court has held that "to make out a violation of § 1985(3), . . . the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Scott, 463 U.S. at 828-29. As to the second element, the Supreme Court has held that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Id. at 829 (quoting Griffin v. Breckenridge, 40 U.S 88, 102 (1971)). Thus, § 1985(3) prohibits persons from conspiring to deny a person of the equal protection of the laws based upon that person's status

as a member of a group. However, § 1985(3) does not prohibit discrimination based upon any membership in any conceivable group but rather is greatly limited.

Suarez-Eden does not directly allege that the defendants' actions were motivated by any class-based animus. However, liberally construing Suarez-Eden's pro se pleading, as this court must, it is possible to discern that Suarez-Eden is perhaps alleging that the defendants undertook the actions that Suarez-Eden complains of because he is a member of the class that opposes AirTran's takeover of Midwest Airlines. This status is insufficient to state a claim for an alleged violation of § 1985(3). The Supreme Court has explicitly held that § 1985(3) does not "reach conspiracies motivated by economic or commercial animus." Scott, 463 U.S. at 838. Therefore, even liberally construing Suarez-Eden's complaint, Suarez-Eden fails to allege that the defendant's actions were motivated by a class-based animus that is protected under § 1985(3). Suarez-Eden's § 1986 claim depends upon his § 1985 claim; absent a § 1985 claim, he may not pursue a § 1986 claim. Thus, Suarez-Eden fails to state a federal claim with respect to his first three causes of action.

Upon concluding that Suarez-Eden has failed to state a claim upon which relief may be granted in federal court with respect to his first three causes of action, it is not appropriate for this court to exercise its supplemental jurisdiction over Suarez-Eden's remaining state-law claims. Additionally, based upon the facts in the complaint, there is no diversity between the parties, which is a separate basis for exercising jurisdiction. Thus, the court is without jurisdiction to address Suarez-Eden's remaining eleven causes of action. These common law causes of action are viable, if at all, only in state court.

**IT IS THEREFORE ORDERED** that the plaintiff's motion to proceed in forma pauperis is **denied**.

**IT IS FURTHER RECOMMENDED** that the plaintiff's complaint be **dismissed**. This case shall be returned to the clerk's office for random reassignment to a district judge.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this <u>16th</u> day of May, 2007.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge
